UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>ROBERT SMITH,<br>　　　　　　　　*Defendant*. | Crim. No. 23-cr-152 (ABJ) |

**DEFENDANT'S SECOND MOTION TO SUPPRESS EVIDENCE**

Defendant Robert Smith respectfully submits this motion to suppress evidence obtained from a warrantless stop and search of his person occurring on October 30, 2021. In support of this motion, Defendant submits the following points and authorities.

**FACTUAL BACKGROUND**

On October 30, 2021, members of the Narcotics and Special Investigations Division of the Metropolitan Police Department (MPD) were operating in the Sixth District. Ex. 1. Officers were patrolling the Mayfair Paradise apartment complex due to sounds of gunshots occurring recently in the area. *Id*. Members of the Division were in plain clothes but were wearing outer vests that were marked "Metropolitan Police Department." *Id*. At the time of this patrol, the officers were familiar with Defendant Robert Smith, having watched his music videos and reviewed his social media accounts. *Id*.

Twelve seconds after 6:27 p.m., the officers entered a parking lot at the 3600 block of Hayes St, NE and jumped out of their vehicle. Ex. 2 at 18:27:12. They ran for five seconds toward a courtyard adjacent to the parking lot where two groups of people were standing around. *Id*. at 18:27:15–18:27:20. Only the first group was visible at the corner of the courtyard adjacent to the parking lot:

1


*Ex. 2 at 18:27:15 – View of first group from the parking lot*


*Ex. 2 at 18:27:18 – View of first group as officers approach*

The second group can be seen on the left as officers ran deeper into the courtyard:


*Ex. 2 at 2:04: Second group (l) seen as officers first approach*


*Ex. 2 at 2:10: Closer view of the second group*

The officers do not seem interested in either of the two groups. After running for five to six seconds from the parking lot, the officers walked briskly for eleven seconds right past the two groups. At that point an officer states "Yellow hoodie" into his radio, and the officers begin jogging directly toward a small yellow dot on the horizon—Defendant Robert Smith. *Id.* at 18:27:31.


*Ex. 2 at 18:27:32 – Officers' view of Smith when they begin running*


*Ex. 2 – Blowup of Smith from same frame*

2

Over the next fifteen seconds, the jogging officers easily caught up to Smith, who was walking alone at a normal pace:



*Ex. 2 – Officers' view of Smith at 18:27:32, 34, 38, 41, 43, 44, 45, and 47 seconds*, respectively

When he saw the officers aggressively running toward him, Smith stopped and turned toward them. He stated, "I don't got nothing, bro." *Id*. at 18:27:44. The officer running toward him immediately responded, "Let me check real quick." *Id*. Smith submitted to this assertion of authority by an officer running directly toward him and stopped. *Id*. at 18:27:46.

When the officer reached him, Smith unzipped and opened his yellow hooded sweatshirt while repeating over and over that he didn't have anything. *Id*. at 18:27:50. He then attempted to walk away.



*Ex. 2 at 18:27:50–19:27:51 – Smith unzips and opens his sweatshirt*

3

The officer then stated, "Hold on a second" and reached out with both hands to grab Smith. *Id*. at 18:27:52–18:27:55. Simultaneously, a second officer aggressively blocked Smith's path. *Id*.



*Ex. 2 at 18:27:55–18:27:56 – One officer pushes Smith's back with both hands while another blocks his path*

The first officer then grabbed Smith by the arm and pulled him, and together the two officers physically restrained and searched him. *Id*. at 18:27:57.



In the course of this takedown—*after* Smith had been grabbed—one of the officers noted for the first time that Smith was "covering his waistband." *Id*. at 18:28:02. The officers then pushed Smith to the ground and began handcuffing him. *Id*. at 18:28:16–18:29:01.

 

At some point while they were pushing him to the ground, a Glock 19 pistol with an extended magazine fell out of Smith's clothes and onto the ground:



*Ex. 2 at 18:28:48 – Glock 19 that fell out during takedown*

Smith was placed under arrest. A search of his pockets revealed two clear bags with 39 blue pills that that appeared to be Percocet along with $463 in cash. *Id*. Smith was also wearing a diamond necklace that officers later claimed to have recognized as a stolen chain from a rival group that Smith had alluded to as stolen in one of his music videos. *Id*.

In a report written **<u>before</u>** any review of body-worn camera (BWC) footage, officers gave a different account of their initial pursuit of Smith. According to the report, as officers were pulling into the parking lot of 3600 Hayes St, NE, they saw "a group" in the courtyard area near 3674 Hayes St, NE. *Id*. While still in the parking area, according to the report, officers saw "a male subject wearing a

5

grey hooded sweatshirt sprint[ing] towards the group." *Id*. According to the report, "[t]his led officers to believe that the subject was alerting the group to the presence of police." *Id*. It is only then, according to the report, that officers "exited their vehicles and made their way towards the group of subjects." *Id*.

According to the report, as they "made their way towards the group of subjects," Officers Robert Marsh and Nicholas Tomasula "observed a male subject who was wearing a yellow hooded sweatshirt separate himself from the group and walk away at a fast pace." *Id*. The report makes no mention of officers recognizing this "male subject" as Smith. Officers Marsh and Tomasula then claim to have "picked up their pace to catch up with this subject." *Id*.

However, as seen in the BWC footage, the officers exited and began running the moment they pulled up in their vehicles, Ex. 2 at 18:27:12, so there was no time for Smith to separate himself for any appreciable distance from any "group of subjects" before they arrived. Despite this, there is no one wearing yellow visible anywhere in the vicinity of any group of people in the video—and certainly not the first group, which was the *only* group that was even barely visible from the parking lot:



*Ex. 2 at 18:27:15 – Officers' view from the parking lot with the first group slightly visible*

Nor was there any observational delay between the officers parking and jumping out, during which they could have seen the alleged man in the gray hooded sweatshirt alerting the group, as the report claims. They simply arrived and began immediately chasing Smith. Nor did they approach any "group of subjects" in a manner indicating they were interested in them, as the report claims: they walked/ran right past the first "group of subjects" that allegedly first drew their suspicion in pursuit of an extremely distant Smith, suggesting they were simply targeting *him*. Finally, when Smith is finally seen on video, he is walking at a normal pace and is easily overtaken in less than 15 seconds by the jogging officers, disproving that he was fleeing the scene at a fast pace after being "alerted." *Id.* at 18:27:35–18:27:48.

## LEGAL STANDARDS

The Fourth Amendment to the United States Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures…." Because of this protection, "all seizures, even ones involving only a brief detention short of traditional arrest," must be "founded upon reasonable, objective justification." *United States v. Gross*, 784 F.3d 784, 786 (D.C. Cir. 2015) (internal quotations and citations omitted). In moving to suppress evidence for alleged Fourth Amendment violations, a defendant generally "has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure." *Rakas v. Illinois*, 439 U.S. 128, 130 n.1 (1978) (citations omitted). "However, when a defendant establishes that he was arrested or subjected to a search without a warrant,…the burden then shifts to the government to justify the warrantless search." *United States v. Gibson*, 366 F. Supp. 3d 14, 19–20 (D.D.C. 2018) (quotations and citations omitted).

The Supreme Court has recognized an exception to the warrant requirement in that "the

police can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause." *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (quoting *Terry v. Ohio*, 392 U.S. 1, 30 (1968)). "While 'reasonable suspicion' is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence," *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000), an officer must "articulate something more than an 'inchoate' and unparticularized suspicion or 'hunch.'" *Sokolow*, 490 U.S. at 7 (quoting *Terry*, 392 U.S. at 27).

When assessing the constitutionality of a stop under *Terry*, the Court must address two central questions: (1) at what point was the defendant seized, *i.e.*, stopped, and (2) whether, at the point of the seizure, the officers were justified in executing it. *United States v. Delaney*, 955 F.3d 1077, 1082 (D.C. Cir. 2020). Additionally, the detention must last no longer than necessary for the legitimate purpose prompted by the stop. *United States v. Sharpe*, 470 U.S. 675 (1985).

**ARGUMENT**

**I.  Smith Was "Seized" When He Saw Police Sprinting Toward Him and Submitted to Their Show of Authority**

"Law enforcement officers do not violate the Fourth Amendment's prohibition of unreasonable seizures merely by approaching individuals on the street or in other public places and putting questions to them if they are willing to listen." *United States v. Drayton*, 536 U.S. 194, 200 (2002). However, "whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person[.]" *Brown v. Texas*, 443 U.S. 47, 50 (1979). Furthermore, a Fourth Amendment seizure occurs "when a person submits to an officer's 'show of authority.'" *United States v. Brodie*, 742 F.3d 1058, 1061 (D.C. Cir. 2014) (quoting *California v. Hodari*, 499 U.S. 621, 626 (1991)).

8

"Whether police action amounts to a 'show of authority' requires the court to ask whether a 'reasonable person' 'in view of all the circumstances surrounding the incident, ... would have believed that he was not free to leave.'" *United States v. Castle*, 825 F.3d 625, 632 (D.C. Cir. 2016) (quoting *United States v. Wood*, 981 F.2d 536, 539 (D.C. Cir. 1992)).

> Factors considered in assessing whether an officer's actions amounted to a show of authority "include whether the suspect was physically intimidated or touched, whether the officer displayed a weapon, wore a uniform, or restricted the defendant's movements, the time and place of the encounter, and whether the officer's "use of language or tone of voice indicat[ed] that compliance with the officer's request might be compelled."

*Id.* (quoting *Wood*, 981 F.2d at 539). A show of authority is typically found where a defendant would have reasonably understood that he or she "was the focus of police attention" and "was not at liberty to ignore the police presence and go about his business." *Delaney*, 955 F.3d at 1081 (quotation and citation omitted) (finding officers' conduct in pulling into a narrow parking lot at night, training a take-down light on the defendant's car; and parking a police cruiser within a few feet of the car's nose amounted to a "show of authority").

Here, there were at least three early moments in the timeline that qualified as stop—either as a submission to a show of authority or as an exercise of physical control. The earliest moment occurred when multiple police officers were seen by Smith as they ran towards him and accosted him while clearly targeting him with their attention. Seeing these officers running toward him while armed and carrying torches, Smith stopped his walk and submitted to their authority, waiting in place until they arrived.

A second moment occurred seconds later when, in response to Smith's claim of innocence, the approaching officer expressly directed Smith to "Let me check." This was a command accompanied by a show of authority that required both a stop and a search to be complied with. This

9

command and show of authority was again submitted to by Smith, who began opening his yellow sweatshirt for the officer's inspection after being ordered to "Let me check." This moment and the first moment both occurred before the officer reached Smith.

A third moment occurred when Smith attempted to walk away from the officer and (1) was grabbed by the officer; (2) was told by the officer to "Hold on," and (3) had his path physically blocked by another officer. All three of these actions by the police were undeniably forms of exercising authority and force over Smith's free movement, and occurred before any officer mentioned observing Smith covering his waistband in his ensuing takedown. Thus, whether the stop is viewed as being complete when Smith (1) was accosted and submitted to a show of authority, (2) was ordered to stop and submit to a search, or (3) was grabbed and physically blocked, the only relevant information for assessing the reasonableness of the stop is what occurred (or was alleged to have occurred) prior to the officers' pursuit of Smith.

## II.   Smith's Seizure Was Not Justified Under Any Version of Events

### A.  Nothing in the Police Version of Events Supported a *Terry* Stop

Even assuming the truth of everything the police reported about Smith's arrest, there was no justification to conduct a stop of Smith. To support the stop, the government can point to the following facts: (1) police were in a high-crime area where shootings had occurred; (2) while they were parked in a parking lot, a man ran up to a group of people in a nearby courtyard; (3) sometime later, while the police were walking up to the group, a different man walked away from the group at a fast walking pace. That is it.

This basic fact pattern—a subject apparently attempting to avoid interactions with police in a high crime area—has been the subject of extensive litigation through the years, resulting in certain

benchmarks for when a stop is constitutional. On the one hand, a defendant's "presence in an area of heavy narcotics trafficking" combined with "headlong flight" upon noticing the police is generally considered sufficient to support a *Terry* stop. *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000). On the other hand, since "the Fourth Amendment protects…the right to be let alone,….[m]erely walking away, even quickly as appellant did, upon the arrival of the uniformed police officer would not provide articulable suspicion of criminal wrongdoing by appellant." *United States v. Jones*, 584 F.3d 1083, 1087 (D.C. Cir. 2009) (quotations and citations omitted); *see also United States v. Veney*, 444 F. Supp. 3d 56, 66 n.6 (D.D.C. 2020) (declining to consider a defendant's decision to "simply walk away from" an officer in analyzing the existence of reasonable articulable suspicion); *United States v. Devaugh*, 422 F. Supp. 3d 104, 111 (D.D.C. 2019) (finding that a defendant "'walk[ing] to his vehicle' after being informed by [a] passerby of police presence in the area" was "not particularly inculpatory[ ]"); *see also United States v. Wilson*, 953 F.2d 116, 121 (4th Cir. 1991) (analyzing "the effect of a person's unsuccessful attempt to terminate what began as a consensual encounter").

Two recent cases in this District, including one by this Court, help frame the analysis of the facts here. In *United States v. Bridges*, 382 F. Supp. 3d 62, 64 (D.D.C. 2019), the defendant was described as altering his conduct and walking away from a group upon hearing a codeword ("Omaha") shouted by someone to alert others of the presence of police. As the defendant walked by a police vehicle, an officer "identified himself as the police and asked if everything was good." *Id*. The defendant kept walking and did not respond. The officer then stopped the car and got out with a "fairly calm" demeanor, *id*. at 65, at which point the defendant "took off running northbound," *id*. at 64, until he was caught and detained by the police.

In ruling that the stop was constitutional, the Court acknowledged that "refusing to interact

11

with an officer…is not itself a criminal act," and that "the Supreme Court has consistently affirmed an individual's 'right to ignore the police and go about his business.'" *Id.* at 68 (quoting *Wardlow,* 528 U.S. at 125). However, the Court drew a distinction between walking away from the police and *running*:

> [A] court might well have found that defendant's mere decision to walk away from the block would not have been enough to support a *Terry* stop if the defendant had in fact been detained as he walked away. But the defendant was seized after something else happened: he ran away. And as the Supreme Court observed in *Wardlow*, "[f]light, by its very nature, is not 'going about one's business'; in fact, it is just the opposite." 528 U.S. at 125.

*Id.* at 68.

Here, all that is alleged is that Smith *walked* away (allegedly at a "fast pace") from a group of people that the police were allegedly walking towards. Ex. 1. That is not flight, and it is consistent with "going about one's business" and simply wanting to avoid getting caught up in whatever the police's intentions were with that group. *C.f. Jones*, 584 F.3d at 1087 ("[W]alking away, even quickly as appellant did, upon the arrival of the uniformed police officer would not provide articulable suspicion of criminal wrongdoing by appellant."). Notably, it is *not* alleged here that Smith walked away, much less ran, after some kind of interaction with police as occurred in *Bridges*. Indeed, the opposite occurred: upon seeing police directing their attention at him, Smith stopped and briefly conversed with the still-running officer, who commanded him to let the officer check him. Smith complied, and after a brief interaction, he attempted to slowly walk away, before being grabbed from behind by the officer. Under these circumstances, the stop of Smith lacked the "headlong flight" and direct evasiveness that carried the day in *Bridges*, and was firmly on the unconstitutional side of the line.

Another recent case in this District underscores the constitutional problem here, even with the facts as alleged by the police. In *United States v. Winecoff*, No. CR 20-266 (RBW), 2021 WL

6196999 (D.D.C. Dec. 30, 2021), the defendant (1) was in a "in a high-crime area"; (2) had a visibly "nervous reaction" to officers approaching him, including that his "eyes widened"; (3) made an "abrupt about-face" when seeing officers, including "suddenly deviating from entering the street and returning to the sidewalk"; and (4) attempted to evade the police by "darting behind [a] white van before quickly ducking into [a burgandy] SUV parked ahead of the van." 2021 WL 6196999 at *6. In analyzing these facts, the Court discussed at length the dividing line between "headlong flight" cases, which support the constitutionality of *Terry* stops, and cases that "acknowledge[] that individuals in high-crime areas disproportionately have negative encounters with the police and, therefore, have greater reason to distrust law enforcement officials and may justifiably exhibit fear when encountering police officers and attempt to avoid such encounters." 2021 WL 6196999 at *9.

Analyzing this divide, the Court drew the same line discussed above between a defendant who "run[s] from the officers," and one who merely "seek[s] to avoid interacting with them." *Id.* Despite the defendant's evasiveness, the Court held it was not evasive enough to justify a *Terry* stop, because "while [the defendant] arguably sought to conceal himself from the officers by entering the burgundy SUV, he remained in an upright seated position—remaining visible to the officers." *Id.* This visibility mattered, because ultimately the question is whether there is a sufficient basis to conclude that criminal activity is afoot. And as the *Winecoff* Court explained, "[w]hile this evidence [of evasiveness] demonstrates that it was understandable for the defendant's activity to attract the officers' attention, it does not amount to the kind of 'specific and articulable facts' necessary to 'support a reasonable and articulable suspicion that [the defendant wa]s engaged in criminal activity.'" *Id.* at *7. Importantly, the Court explained, it "is not just that there are innocent reasons to explain the defendant's behavior. Beyond mere susceptibility to an innocent explanation, the government's

evidence does not establish that the officers witnessed conduct that was by itself lawful, but that also suggested that the defendant was engaged in some kind of unlawful activity." *Id.* (quotations and citations omitted). *See also United States v. Alvin*, 701 F.App'x 151 (3d. Cir. 2017) ("[N]ot every slouch, crouch, or other supposedly furtive movement[6] justifies a stop" given that it is "not uncommon for most citizens—whether innocent or guilty—to exhibit signs of nervousness when confronted by a law enforcement officer") (holding that exiting a car and ducking behind it in response to police presence in a high-crime area did not support a reasonable articulable suspicion determination).

If the overt evasiveness of the defendant in *Winecoff* did not justify a *Terry* stop in the absence of headlong flight, the alleged actions of Smith here—walking away quickly from a group *before* the police even got there—hardly suffices to justify an order that he stop and comply with the dictates of the police. There are simply far too many other reasons why a citizen would want to avoid an encounter with the police in a high-crime area, including "that individuals in high-crime areas disproportionately have negative encounters with the police and, therefore, have greater reason to distrust law enforcement officials and may justifiably exhibit fear when encountering police officers and attempt to avoid such encounters." Id. at *9 (citing *Wardlow*, 528 U.S. at 132 (Stevens, J., concurring in part) ("Among some citizens, particularly minorities and those residing in high crime areas, there is also the possibility that the fleeing person is entirely innocent, but, with or without justification, believes that contact with the police can itself be dangerous, apart from any criminal activity associated with the officer's sudden presence."). There is no allegation here that Smith ever even ran from the police, much less engaged in "headlong flight," much less fled after an interaction with the police. The constitution permits calmly and quickly walking away from a group of "subjects"

that the police are approaching, and forbids stopping someone for doing so, with no other indication that crime is afoot.

### B. The BWC Footage Belies the Police Version and Further Eviscerates Any Justification for a *Terry* Stop of Smith

Even if the stop in this case could somehow be justified under the alleged facts in the MPD report, the BWC footage utterly belies the primary claimed rationale for the stop, leaving the government with no basis to allege that the decision to chase down and stop Robert Smith complied with the constitution. As written, the report claims that the officers who chased Smith and ordered him to stop saw him separate himself from the "group of subjects" and walk quickly away when the police approached the group. Ex. 1. However, nothing is clearer in the video than the fact that Smith was nowhere to be seen as the officers walked up to and past the two groups of men in the courtyard, despite the fact that the officers were running from the moment they exited their vehicles. *See* Ex. 2 at 18:27:16–18:27:21 (showing officers running past group of men, turning into the courtyard, and having a clear view down the entire courtyard, with no yellow-hooded person in sight). Unless Smith was in a full-on sprint from the group *and* is a much faster runner than the officers—to an Olympic-degree—there is simply no way to explain how he managed to get so far from the group of men at the edge of the courtyard near the parking lot in the five seconds it took officers to run to the group from the parking lot and turn into the courtyard. And of course, after the officers jog down to Smith, he shows no sign of having been running, much less sprinting, but was merely walking at a normal pace and speaking in a calm manner. *Id*. at 18:27:47. The evidence does not support any claim of evasiveness, much less the necessary running or "headlong flight" that distinguishes evidence of criminality from a citizen's lawful desire to avoid interacting with police.

## CONCLUSION

For the foregoing reasons, the Court should exclude all physical evidence obtained from the unconstitutional search and seizure of Defendant Robert Smith on October 30, 2021.

.

February 2, 2024                                   Respectfully submitted,

<u>/s/ Matthew J. Peed .</u>
Matthew J. Peed (D.C. Bar No. 503328)
CLINTON & PEED
1775 I St. NW, Suite 1150
Washington, D.C. 20006
(202) 919-9491 (tel)
(202) 587-5610 (fax)

*Counsel for Defendant Robert Smith*