UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>ROBERT SMITH,<br>　　　　　　　　　*Defendant*. | Crim. No. 23-cr-152 (ABJ) |

**DEFENDANT'S MEMORANDUM IN AID OF SENTENCING**

Robert Smith is an incredibly intelligent and gifted young man with a bright future. He is passionate, driven, and already recognized as one of D.C.'s best young artists, with music available through Spotify, Apple, and other platforms. Unfortunately, growing up in the Paradise housing complex in Southeast D.C. exposed Robert to drugs and violence at an early age. Although he has made strives to use music as a positive force for his community, his path to recovery—like most people with exposure to trauma and substance abuse—has not always been a straight line. However, the last 18 months in D.C. jail, which included a severe knife attack by inmates of a rival neighborhood, have greatly matured him. Robert now stands before the Court having accepted responsibility for possessing a firearm and ready to face the consequences. He wishes nothing more than to move on with building a great life for himself and setting an example for his family and community.

The parties concur with probation that the Guidelines range is 41–51 months. Probation has submitted a recommendation of 41 months. Respectfully, the defense submits that the purposes of sentencing can be fully met with a sentence of 33 months, which is the high end of the Guidelines range prior to enhancement. This request balances the seriousness of the offense with a recognition of Robert's challenging upbringing, dangerous living situation, personal struggles with substance addiction, attack in jail, maturation in confinement, and great potential to give back to his community.

## LEGAL STANDARDS

The fundamental requirement of a federal sentence is to be "sufficient, but not greater than necessary, to comply with the purposes" set forth in 18 U.S.C. § 3553(a). Courts must consider ten factors when sentencing a defendant: (1) "the nature and circumstances of the offense"; (2) "the history and characteristics of the defendant"; (3) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (4) the need to afford adequate deterrence to criminal conduct; (5) the need to protect the public from further crimes of the defendant; (6) the need to provide the defendant with needed correctional treatment; (7) the kinds of sentences available; (8) the Sentencing Guidelines and policies; (9) the need to avoid unwarranted sentencing disparities; and (10) the need to provide restitution to any victims of the offense. These requirements reflect the "uniform and constant federal judicial tradition of considering every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Gall v. United States*, 552 U.S. 38, 52 (2007) (quotation omitted).

## ANALYSIS

The starting point for sentencing is the advisory sentencing Guidelines. Here, the Guidelines range of 41–51 months reflects a three-level enhancement for a small amount of cocaine that Mr. Smith was carrying to distribute. Without this bump, the range would be 27–33 months.

While he acknowledges that he was distributing cocaine, Robert was not a significant dealer. He sold small amounts to support his documented opioid addiction. His firearm possession was less about pushing drugs than protecting himself in a neighborhood where rivalries could lead to shootouts at any moment. Such a shootout resulted in a gunshot wound from being at the wrong place at the wrong time, which ultimately contributed to his opioid addiction. Another targeted killing stole one

2

of his best friends, which features prominently in his music. While the government has described lyrics about firearms in Robert's music, the reality is that he lived in a violent neighborhood and described that reality through his music. Even in jail, surrounded by guards, the violence of his neighborhood was able to reach Robert. In this context, the three-level enhancement overstates the connection between his gun possession and drug-dealing.

In addition, the Guidelines are based on national statistics that do not take into account the local pressures that underlie crime statistics for young men (such as Robert) living in dangerous neighborhoods, where firearms are often carried for personal protection. More relevant and helpful are statistics from the D.C. Sentencing Commission (DCSC) on sentencing outcomes for felon-in-possession (FIP) cases in *this* District. According to the DCSC, the average prison sentence for FIP was 16 months, while the median sentence was 14 months. Ex. 3. Both of these measures are less than *half* of the requested sentence of 33 months, even though by definition all FIP offenders have at least one felony in their criminal history. Looking to sentences for FIP cases cited by the DCSC would help promote the sentencing goal of avoiding unwarranted sentencing disparities for D.C. residents. *See United States v. Mapp*, 2007 WL 485513 (E.D. Mich. Feb. 9, 2007) (departing downward in part based on state and federal sentencing disparity, where defendant noted that in a state prosecution, he would be facing 9–46 months prison as felon-in-possession, while he was facing 84–105 in federal prosecution); *United States v. Wilkerson*, 411 F.3d 1 (1st Cir. 2005) (holding that district court may consider disparate treatment between federal and state court sentences in similar cases).

Robert's history and characteristics also support the requested sentence. Robert has overcome and achieved a lot in his young life. He describes his childhood as "a rollercoaster." PSR ¶ 60. His family struggled financially, and his father wrestled with a PCP addiction and drug-related arrests. *Id*.

As a result, Robert and his family were forced to live in violent neighborhoods with "shootings, fights, stabbings, and robberies occurring on a regular basis." *Id*. at ¶ 59. Understandably, this tumultuous childhood motivated Robert to move out of the family home at a young age to get a job and "get quick money." *Id*. at ¶ 61.

Despite these challenges, however, Robert was a determined student, earning his high school diploma. His mother describes him as "always eager to learn" and "loved by all his teachers and his peers." Ex. 1. He is also, as his cousin describes him, "a compassionate and naturally gifted leader." *Id*. at 4. He has a natural charisma and intelligence that inspires friendship and affection. His aunt describes him as "a caring and compassionate young man" with "a natural ability to uplift others." *Id*. at 5.

Giving back has always been important to Robert. He joined and supported anti-violence organizations in the neighborhood, including Shoot Hoops Not Guns and Box Don't Blast, which used sports as a vehicle to create positive outlets for youth. He has also contributed financially to the family from a young age. His mother describes a time when she could not afford materials for her daughter's 8th grade prom. *Id*. at 1. Robert told her not to worry about it and that he would handle it, "and he did." *Id*. His sister describes him as "loving and caring," someone who would "give a person the coat on his back if he had to." *Id*. at 3. She states that Robert "is very protective of his family and he is a family orientated person." *Id*.

Robert's passion is music and he has already developed a significant following. He has been "hailed as a well-respected rapper and guided by Pleasant Service LLC's music mentorship program via a mentor/protege relationship with Whop Craig aka Wisdom Speeks." Ex. 2, D. Kevin McNeir, *D.C. Rapper Sneaky Bandz Uses Painful Past to Guide Youth in Positive Directions*, WASHINGTON

4

INFORMER (July 20, 2022). Robert has described his music as "aiming to elevate my community and inspire other youth to get on a track towards a better and more positive future," to "let go of negative influences" and to help the youth "do better." *Id*. Shedding any pretense of being "hard," Robert spoke openly to the press about the need for youth to escape the poverty and violence he experienced:

> "When you see the news about so many young people being arrested and committing violent crimes, it's crazy," said Sneaky Bandz, 22, the fourth of seven children who matriculated at Friendship Collegiate in Northeast.
>
> "Some things may be really hard – even impossible – to change, especially if they've been going on for a lot of years," he said. "But if someone like me can let go of negative influences and do better, then everyone can. Being cool means nothing. We've got to go to school and get an education."
>
> "Young people also need to return to playing sports as a means of improving themselves – maybe as a way of going to college. But that's tough to accomplish when you live in a place like my neighborhood where the resources are so limited. We don't even have playgrounds and we don't have sports leagues for youth," said Sneaky Bandz who once actively participated in sports and whose penchant for gym shoes led to the name he adopted for professional purposes….
>
> "I want to show the younger generations both sides and help them see that they have a choice. I want to be remembered for something positive — to be a role model. I don't want to be the dude from the hood that went hard."
>
> "I made some bad choices that I would later regret but I never really let someone else persuade me to make those decisions," he said. "I've always wanted to live as long as God allows. Now, I've become even more determined to prove the naysayers wrong and to take a different path in my life. I have a gift from God and I want to use my talents to help young people no matter whether they're Black or white. I want my music to touch minds, hearts and souls."

*Id*. at 2–3. The government has previously described Robert's statements in this article as inaccurate, but it is more appropriate to call them aspirational. Robert clearly has a heart for his community and for being a better example, even if the financial needs of his family, the struggles of opioid dependence, the love for fallen friends, and the pull of the streets are at times overwhelming. Anyone with experience knows that recovery is seldom a straight line. However, Robert has both the ability and the

5

desire to make his musical dreams come true, including his dream to lead his community down a better path than he has walked up to now. And the community is behind him, including the music community, which has given Robert a record deal that is waiting for him when he completes his sentence.

Robert's youth and immaturity have contributed to his offense, a factor courts have recognized as highly mitigating. *See Gall v. United States*, 552 U.S. 38, 58 (2007) ("Immaturity at the time of the offense conduct is not an inconsequential consideration. Recent studies on the development of the human brain conclude that human brain development may not become complete until the age of twenty-five .... [T]he recent [National Institute of Health] report confirms that there is no bold line demarcating at what age a person reaches full maturity. While age does not excuse behavior, a sentencing court should account for age when inquiring into the conduct of a defendant.") (quoting sentencing court); *Roper v. Simmons*, 543 U.S. 551, 567 (2005) ("The relevance of youth as a mitigating factor derives from the fact that the signature qualities of youth are transient; as individuals mature, the impetuousness and recklessness that may dominate in younger years can subside."); *United States v. Montanez*, 2007 WL 2318527 (E.D. Wis Aug. 9, 2007) (imposing sentence of fifteen months where Guidelines were forty-six to fifty-seven month where defendant's prior convictions primarily occurred when defendant was very young and court notice, difference in his maturity at time of sentencing); *United States v. Naylor*, 359 F. Supp. 2d 521 (W.D. Ve. 2005) (imposing non-career offender sentence of 120 months, rather than 188, because of defendant's youth at the time of priors). Having now served 18 months, Robert has visibly matured during this case, and counsel has no doubt that he will shine after his term is complete. Robert's current plans are to continue making music and to enroll in college, ultimately with hopes of entering law school. This is

a goal undersigned counsel has encouraged, as Robert has been heavily involved in analyzing the intricate legal questions of his multiple suppression motions, and has shown great aptitude for legal questions. With all he has overcome and all he has to look forward to, an additional 8 months of incarceration beyond the 33 months requested would not serve any of the purposes of sentencing under § 3553(a).

An effective 3-level downward variance of 8 months would also be a fair accounting for the unusually extreme insecurity and physical danger Robert has had to live with at D.C. jail for the entirety of his pretrial detention. Courts have recognized such downward variances or departures when a defendant has been confined in particularly difficult conditions. *See, e.g.*, *United States v. Mateo*, 299 F. Supp. 2d 201 (S.D.N.Y. 2004) (granting downward departure based on presentence prison conditions where defendant was sexually abused by prison guard); *United States Rodriguez*, 214 F. Supp. 2d 1239 (M.D. Ala. 2002) (granting three-level downward departure in drug case because defendant was sexually assaulted by prison guard); *United States v. Orth*, 2007 WL 4208802 (D. N.J. Nov. 27, 2007) (approving variance based on pretrial confinement at county jail that was overcrowded, dangerous, and unhygienic). Here, Robert was attacked and stabbed multiple times by four inmates from a rival neighborhood, requiring surgery and almost costing his life. As a result of this incident, he has lived in constant fear and anxiety, having to watch over his shoulder at all times. This severe psychological toll was on top of the already difficult and widely-documented poor conditions at D.C. jail, where overcrowding and frequent lockdowns present far harsher conditions than a typical unit in the Bureau of Prisons. Given the uniquely difficult nature of Robert's period of

pretrial incarceration, a small variance of 8 months is a reasonable accommodation to reflect this especially difficult physical and psychological toll.[1]

The need for deterrence, both specific and general, would also be fully met by the requested sentence of 33 months. While many believe that lengthier sentences have a greater deterrent effect, the empirical research shows this to be untrue. "Three National Academy of Science panels … reached that conclusion, as has every major survey of the evidence." Michael Tonry, *Purposes and Functions of Sentencing*, 34 CRIME AND JUSTICE: A REVIEW OF RESEARCH 28–29 (2006). In one of the best studies of specific deterrence, no difference in deterrence was found even between probation and imprisonment. *See* David Weisburd *et. al.*, *Specific Deterrence in a Sample of Offenders Convicted of White-Collar Crimes*, 33 CRIMINOLOGY 587 (1995). What studies show is that "effective deterrence arises from [the] certainty, not harshness, of punishment." *United States v. Bannister*, 786 F. Supp. 2d 617, 668 (E.D.N.Y. 2011). *See* National Institute of Justice, Five Things about Deterrence, at 1 (May 2016), *available at* https://www.ncjrs.gov/pdffiles1/nij/247350.pdf (stating, among other things, that "[i]ncreasing the severity of punishment does little to deter crime," and "[t]he certainty of being caught is a vastly more powerful deterrent than the punishment"). Given this reality, adding an extra 8 to 18 months would serve no additional deterrent purpose.

A lengthy sentence is especially unnecessary when, as here, the defendant has not previously served a significant custodial term. *See, e.g., United States v. Collington*, 461 F.3d 805 (6th Cir. 2006) (upholding sixty-month downward variance in part because defendant had only been incarcerated for seven months prior to his crime); *United States v. Newhouse*, 919 F. Supp. 2d 955 (N.D. Iowa 2013)

---

[1] Notably, the four inmates who almost killed Robert received plea deals with sentencing ranges of 6 to 22 months, far lower than the 33 months Robert is requesting for the mere possession (not use) of a firearm. Yet, these four individuals would likely have killed Robert had they encountered him unarmed outside the confines of D.C. jail.

(varying downward where defendant's only two prior convictions resulted in probationary sentences). For such defendants, their first serious taste of imprisonment is often enough to set them straight, making a shorter sentence have the same effect as a longer sentence for someone accustomed to the challenges of incarceration. Although Robert served almost nine months when he was 19, that experience was far different than the 18 months he has already served—during which he almost lost his life—and the prospect of another 15 months more. Little purpose would be served, from the standpoint of deterrence, in lengthening this period an additional 8 months.

Excluding these eight months, on the other hand, would help fight recidivism. Studies reveal that offenders who are sentenced to long periods of incarceration are *more* likely to reoffend, not less. "When prison sentences are relatively short, offenders are more likely to maintain their ties to family, employers, and their community, all of which promote successful reentry into society. Conversely, when prisoners serve longer sentences they are more likely to become institutionalized, lose pro-social contracts in the community, and become removed from legitimate opportunities, all of which promote recidivism." Valerie Wright, *Deterrence in Criminal Justice*, The Sentencing Project, at 7 (2010). *Id*. For someone like Mr. Smith, who has had trouble with the law as a youth but has not yet had a significant period of incarceration, a 33-month sentence will serve as a needed wake-up call without severely severing him from these important social ties and future economic opportunities.

Other purposes of sentencing will also be better served by a 33-month sentence. For example, § 3553(a)(2)(D) requires the judge to consider "the need for the sentence imposed ... to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." A shorter period of incarceration followed by mandatory supervisory condition of drug treatment would greatly serve the sentencing goal of rehabilitation and

9

education. Studies have shown that individuals who complete drug treatment programs have far lower rates of recidivism, and the rate is lower for those who complete drug treatment in the community than those who complete it in prison. Lisa Rosenblum, *Mandating Effective Treatment for Drug Offenders*, 53 HASTINGS L.J. 1217, 1220 (2002). Likewise, a shorter period followed by structured supervision would foster educational and vocational training, allowing Robert to work on his music career and education while decreasing the interruption of employment and other negative side effects of prolonged incarceration, including exposing less serious offenders to more serious offenders.

Judges are also instructed to consider alternatives to custodial sentences. A great alternative to counterproductive periods of prolonged incarceration is rigorous community service, which allows the defendant to learn something from the experience. A 2005 report issued by U.S Probation and Pretrial Services encourages the use of community service sentences as "a flexible, personalized, and humane sanction, a way for the offender to repay or restore the community. It is practical cost-effective, and fair, a 'win-win' proposition for everyone involved." PROBATION AND PRETRIAL SERVICES DIVISION OF THE ADMINISTRATIVE OFFICE OF THE U.S. COURTS, *Community Service Sentence* (2005). According to the report, "community service addresses the traditional sentencing goals of punishment, reparation, restitution, and rehabilitation ... It restricts offenders' personal liberty, allows offenders to atone or 'make the victim whole' in a constructive way [and] may be regarded as a form of symbolic restitution when the community is the victim." *Id*. Further, "[c]ourts can use community service successfully with a wide spectrum of offenders: corporations and individuals, first offenders and recidivists, the indigent and the affluent, juveniles and senior citizens." *Id*. Given his background in community service, renown as an up and coming artist, and natural

leadership ability, Robert would be an ideal candidate for the creative use of community service in a sentence as an alternative to unthinking incarceration.

## CONCLUSION

For the reasons described above, a sentence of 33 months with supervised drug treatment and community service is "sufficient, but not greater than necessary, to comply with the purposes" set forth in § 3553(a).

.

December 6, 2024                                            Respectfully submitted,

/s/ Matthew J. Peed .
Matthew J. Peed (D.C. Bar No. 503328)
CLINTON & PEED
1775 I St. NW, Suite 1150
Washington, D.C. 20006
(202) 919-9491 (tel)
(202) 587-5610 (fax)

*Counsel for Defendant Robert Smith*